# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | | |
|---|---|---|
| KORY RAZAGHI; ATTENTUS LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 2:18-cv-01622-GMN-DJA |
| vs. | ) | |
| | ) | **ORDER** |
| RAZAGHI DEVELOPMENT COMPANY, | ) | |
| LLC; AHMAD RAZAGHI; MANUEL | ) | |
| MORGAN, | ) | |
| | ) | |
| Defendants. | ) | |

Pending before the Court is the Motion to Dismiss the Third Amended Complaint, (ECF No. 123), filed by Defendants Ahmad Razaghi ("Ahmad") and Razaghi Development Company, LLC ("RDC"), (collectively, "Defendants"). Plaintiffs Attentus LLC ("Attentus") and Kory Razaghi ("Kory"), (collectively, "Plaintiffs"), filed a Response, (ECF No. 124), and Defendants filed a Reply, (ECF No. 128).

Also pending before the Court is Plaintiffs' Motion for Partial Summary Judgement, (ECF No. 129). Defendants filed a Response, (ECF No. 137), and Plaintiffs filed a Reply, (ECF No. 145).

Also pending before the Court is Defendants' Cross-Motion for Partial Summary Judgment, (ECF No. 138). Plaintiffs filed a Response, (ECF No. 147), and Defendants filed a Reply, (ECF No. 149).

For the reasons discussed below the Court **GRANTS in part** and **DENIES in part** the Motion to Dismiss. The Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment. The Court **GRANTS in part** and **DENIES in part** Defendants' Cross-Motion for Partial Summary Judgment.

*//*

## I. <u>BACKGROUND</u>

This case arises from Defendants' alleged breach of the Settlement Agreement that the parties executed to terminate their state court litigation, which concerned the parties' healthcare management and consulting ventures.  Plaintiffs allege that Kory and Ahmad formed Attentus in 2006. (Third Am. Compl. ("TAC") ¶ 8, ECF No. 122).  Attentus then joined with Defendant Manuel Morgan ("Morgan") to form M. Morgan & Associates, LLC ("MMA"). (*Id.* ¶ 9).  MMA subsequently executed a contract with Navajo Health Foundation-Sage Memorial Hospital ("Sage"), (the "Sage Contract") in February of 2007.  Under the Sage Contract, Sage allegedly agreed to pay MMA several hundred thousand dollars per year over a period of three years to develop, finance, and build a new hospital for Sage in Ganado, Arizona. (*Id.* ¶¶ 10–12).

As MMA and Sage's relationship matured, the Sage Contract went through a series of amendments.  MMA and Sage first amended the Sage Contract by executing the "Management Addendum" in March of 2007. (*Id.* ¶ 13).  The Management Addendum allegedly engaged MMA to provide "management services" to Sage's existing hospital in exchange for $900,000 per year, paid in addition to the compensation provided under the original Sage Contract. (*Id.* ¶¶ 14–15).

MMA and Sage next amended the Sage Contract in March of 2009 under the "Second Addendum." (*Id.* ¶ 16).  The Second Addendum allegedly extended the term of the Management Addendum through the end of September of 2013, altered compensation terms, and appointed Ahmad as CEO of Sage's hospital. (*Id.* ¶ 17).  In 2010, just before disputes over the Sage Contract arose, Kory and Ahamad executed an Operating Agreement for Attentus (the "Attentus Operating Agreement"). (*Id.* ¶¶ 18, 20).  Under the Attentus Operating Agreement, Kory and Ahmad allegedly became entitled to equal revenues received for healthcare consulting services, provider group and physician services, and "all related services" paid under the Sage Contract and its amendments. (*Id.* ¶ 19).

When disputes over the Sage Contract surfaced in 2010, Ahmad allegedly formed a single-member LLC, Razaghi Healthcare LLC ("RH")[1], and did not disclose the existence of the entity to Kory until January of 2013. (*Id.* ¶¶ 20–24).  In March of 2011, Ahmad and the chairperson of the Sage Board of Directors allegedly executed a "CEO Services Contract" between Sage and RH. (*Id.* ¶ 25).  Under the CEO Services Contract, Ahmad would continue to serve as CEO of Sage until February 28, 2015, and the agreement backdated the commencement of all CEO services performed under the Contract to November 10, 2010. (*Id.* ¶¶ 25–27).  Kory alleges he was unaware of the CEO Services Contract until just before the execution of the Settlement Agreement. (*Id.* ¶ 28).

On April 21, 2011, Kory filed a civil suit in Nevada state court against Ahmad, Morgan, RDC, and other related entities. (*Id.* ¶ 29).  On May 6, 2011, Morgan and Ahmad formed a limited liability company, Morgan Razaghi Healthcare ("MRH"), for the purpose of eventually assuming the obligations of the Sage Contract once the Sage Contract could be assigned from MMA. (*Id.* ¶ 30).  The parties settled the state court litigation on January 11, 2013, executing the Settlement Agreement that Plaintiffs now allege Defendants breached. (*See id.* ¶ 31); (Settlement Agreement, Ex. 6 to Pls.' Mot. Summ. J. ("MSJ"), ECF No. 130-5).[2]  There are two classes of payments Kory alleges he has not been paid in breach of the Settlement Agreement—

---

[1] Plaintiffs allege that there are "Razaghi Healthcare LLCs" formed in Nevada and Arizona. (*See* Am. Compl. ¶ 31 n.1).  The Court uses RH to refer to the companies collectively because neither party alleges that the distinct identities of the companies is material.

[2] Plaintiffs attempt to incorporate the Settlement Agreement by reference as an Exhibit to the TAC, (*See* TAC ¶ 31 n.2) ("The Settlement Agreement is attached to this Complaint as Exhibit 1"), but they have not filed any exhibits to the TAC.  However, Plaintiffs previously filed the Settlement Agreement under seal. (*See* Settlement Agreement, Ex. A to Mot. Leave File Under Seal, ECF No. 28-1); Plaintiffs again filed a Settlement Agreement, containing identical terms as the previously filed Settlement Agreement, pursuant to a Stipulated Protective Order. (*See* Settlement Agreement, Ex. 6 to Pls.' Mot. Summ. J., ECF No. 130-5).  Defendants do not dispute the authenticity of the Settlement Agreement. (*See* Defs.' Resp. to Pls.' Mot. Summ J., Statement of Undisputed Facts ¶ 14, ECF No. 137) (incorporating Plaintiffs' Exhibit by reference).  Therefore, when discussing the Settlement Agreement, the Court relies upon Exhibit 6 to Plaintiffs' Motion for Partial Summary Judgment.  The Court may also rely on the Settlement Agreement when considering the Motion to Dismiss. *See* Fed. R. Evid. 201; *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).

"management fees" and "Bonus Payments." (*See* Compl. ¶ 71); (Settlement Agreement ¶¶ 1.7, 1.9).

### A.     Management Fees

The Settlement Agreement provides that Kory shall be paid one-sixth of all "management fees" received by MMA, MRH, or their successors or assigns under the Sage Contract. (Compl. ¶ 32); (Settlement Agreement ¶ 1.7).  Paragraph 1.7 of the Settlement Agreement also provides, "[i]t is the intent of the parties that if [MMA], AHMAD or [MORGAN] or any of their owned or controlled entities executes a contract with SAGE that includes substantially the same services as are included in the currently existing contract and its extensions, KORY will be entitled to share in the payments received in this Agreement." (Settlement Agreement ¶ 1.7).  The provision also expressly extends to extensions or newly executed "management contracts" that provide management fees to any entities that Ahmad and Morgan hold interests in. (*Id.*).

The Settlement Agreement also includes relevant disclaimers of Kory's rights that may bear on his claim to receive a portion of management fees paid under the CEO Services Contract.  First, ¶ 1.7 of the Settlement Agreement provides that "nothing" in ¶ 1.7 applies to "the contract for AHMAD to serve as CEO of SAGE." (Settlement Agreement ¶ 1.7).  Additionally, Kory disclaimed all rights to payments made under "any contract pursuant to which AHMAD serves as chief executive officer of SAGE." (*Id.* ¶ 1.8).

Plaintiffs allege that Defendants deprived Kory of the benefits of the Settlement Agreement in bad faith. (TAC ¶ 48).  In substance, Plaintiffs contend that Ahmad influenced the Sage Board of Directors to refrain from extending the Sage Contract and instead amend the CEO Services Contract to include payments for the same services. (*Id.* ¶¶ 48–56, 58, 60–62).  As a result, Plaintiffs claim that the scope of the payments disclaimed exceeded the intent of the parties when executing the Settlement Agreement. (*Id.* ¶¶ 57, 59, 72, 80–81).

### B.    Bonus Payment

Plaintiffs allege through various contract and tort claims that Defendants breached their obligation to disclose and pay Plaintiffs a portion of the $1,842,549.97 bonus payment (the "Bonus Payment") that Sage paid to RH in September of 2012. (*Id.* ¶ 36).  Under the Settlement Agreement, Kory is entitled to one-sixth of all Bonus Payments MRH or its successors or assigns receives under the Sage Contract. (*Id.* ¶ 32); (Settlement Agreement ¶ 1.9).  However, the Settlement Agreement also provides a release that waives all the parties' known or unknown claims that predate the execution of the Settlement Agreement and are connected with the state-court action. (Settlement Agreement ¶ 2.1).  Plaintiffs allege that because the Bonus Payment was given for progress made in managing Sage from 2007–2012, while the Sage Contract remained in effect, Kory should have received a portion of the Bonus Payment. (TAC ¶¶ 10, 19, 38–40, 43).

Plaintiffs now assert claims for: (1) Breach of the Settlement Agreement; (2) Breach of the Duty of Good Faith and Fair Dealing (Settlement Agreement); (3) Breach of the Duty of Good Faith and Fair Dealing (Attentus Operating Agreement); (4) Breach of Fiduciary Duty; (5) Unjust Enrichment; (6) Conversion; (7) Intentional Interference with Contractual Relations; (8) Accounting; (9) Civil Conspiracy; (10) Alter Ego; and (11) Successor Liability. (*See id.* ¶¶ 64–147).  Defendants move to dismiss the TAC. (*See* Mot. Dismiss, ECF No. 123).  The parties also move for summary judgment regarding Plaintiffs' entitlement to management fees paid under the CEO Services Contract after Ahmad resigned as CEO of Sage's hospital[3] in February of 2013. (*See* Cross-Mots. Summ. J., ECF Nos. 129, 138).

---

[3] Plaintiffs allege that they are entitled to management fees paid under the CEO Services Contract after Ahmad resigned as CEO of Sage because the Settlement Agreement's disclaimers only apply when Ahmad served as CEO. (Pls.' MSJ 20:19–24:19, ECF No. 129).  Plaintiffs further allege that Ahmad testified in a deposition that he resigned as CEO of Sage on September 26, 2013. (Ahmad Decl. ¶ 5, Ex. 12 to Pls.' MSJ, ECF No. 131-12).  Defendants dispute Plaintiffs' interpretation of the relevant disclaimers' scope. (Defs.' MSJ 14:23–19:25, ECF No. 138).  Defendants also argue that even if the Court accepts Plaintiffs' interpretation, Kory was not entitled to any management fees paid under the CEO Services Contract because Ahmad continued to serve as corporate

1

## II.   <u>LEGAL STANDARD</u>

2

### A.   12(b)(6)

3

Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action

4

that fails to state a claim upon which relief can be granted. *See N. Star Int'l v. Ariz. Corp.*

5

*Comm'n*, 720 F.3d 578, 581 (9th Cir. 1983).  When considering a motion to dismiss under Rule

6

12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not

7

give the defendant fair notice of a legally cognizable claim and the grounds on which it rests.

8

*See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In considering whether the

9

complaint is sufficient to state a claim, the Court will take all material allegations as true and

10

construe them in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792

11

F.2d 896, 898 (9th Cir. 1986).

12

The Court, however, is not required to accept as true allegations that are merely

13

conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden*

14

*State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  A formulaic recitation of a cause of action

15

with conclusory allegations is not sufficient; a plaintiff must plead facts showing that a

16

violation is plausible, not just possible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing

17

*Twombly*, 550 U.S. at 555).

18

"Generally, a district court may not consider any material beyond the pleadings in ruling

19

on a Rule 12(b)(6) motion … However, material which is properly submitted as part of the

20

complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard*

21

*Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citations omitted).  Similarly,

22

"documents whose contents are alleged in a complaint and whose authenticity no party

23

questions, but which are not physically attached to the pleading, may be considered in ruling on

24

25

CEO of Sage through 2018, and he resigned only from the position of hospital CEO in September 2013. (*Id.*
19:26–23:18).  The Court addresses these arguments in its summary judgment discussion.

a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgement. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).  Under Federal Rule of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986).  Otherwise, if the district court considers materials outside of the pleadings, the motion to dismiss is converted into a motion for summary judgement. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

If the court grants a motion to dismiss for failure to state a claim, leave to amend should be granted unless it is clear that the deficiencies of the complaint cannot be cured by amendment. *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).  Pursuant to Rule 15(a), the court should "freely" give leave to amend "when justice so requires," and in the absence of a reason such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

### B.    Summary Judgment

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A

1  principal purpose of summary judgment is "to isolate and dispose of factually unsupported

2  claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

3        In determining summary judgment, a court applies a burden-shifting analysis.  "When

4  the party moving for summary judgment would bear the burden of proof at trial, it must come

5  forward with evidence which would entitle it to a directed verdict if the evidence went

6  uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing

7  the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp.*

8  *Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In

9  contrast, when the nonmoving party bears the burden of proving the claim or defense, the

10  moving party can meet its burden in two ways: (1) by presenting evidence to negate an

11  essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

12  party failed to make a showing sufficient to establish an element essential to that party's case

13  on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 323–24.  If

14  the moving party fails to meet its initial burden, summary judgment must be denied and the

15  court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S.

16  144, 159–60 (1970).

17        If the moving party satisfies its initial burden, the burden then shifts to the opposing

18  party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v.*

19  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute,

20  the opposing party need not establish a material issue of fact conclusively in its favor.  It is

21  sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

22  parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

23  *Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid

24  summary judgment by relying solely on conclusory allegations that are unsupported by factual

25  data. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go

beyond the assertions and allegations of the pleadings and set forth specific facts by producing

competent evidence that shows a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the

truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.  The

evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in

his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not

significantly probative, summary judgment may be granted. *Id.* at 249–50.

## III.   __DISCUSSION__

The Court's below discussion first addresses the parties' cross-motions for partial

summary judgment before addressing Defendants' Motion to Dismiss.

### A.      **Cross-Motions for Partial Summary Judgment**

Plaintiffs move for partial summary judgment on their entitlement to "management fees"

under the Settlement Agreement that Sage paid to RDC during fiscal year 2014 ("FY14").  (*See*

Pls.' MSJ 1:17–20, ECF No. 129).  Plaintiffs essentially argue that: (a) the Settlement

Agreement requires Defendants to pay Kory one-sixth of the management fees that Defendants

received from Sage; (b) management fees were previously paid under the Sage Contract as

amended; but (c) the Sage Contract was allowed to expire, and the management fees paid

thereunder were incorporated into the CEO Services Contract, entitling Kory to the same. (*Id.*

2:16–3:8).  Plaintiffs only move for partial summary judgment as to their right to management

fees paid under the CEO Services Contract in FY14 because any disclaimers of Kory's rights to

proceeds of the CEO Services Contract became ineffective once Ahmad allegedly resigned as

CEO of Sage. (*Id.* 3:9–13, 23:24–28:19).

Plaintiffs' Motion for Partial Summary Judgment therefore requests that the Court hold

Defendants breached the Settlement Agreement by failing to pay Kory one-sixth of the

$1,861,782.29 Defendants allegedly received for "management services" under the CEO

1   Services Contract in FY14. (*Id.* 2:26–3:8, 3:14–20).  In the alternative, Plaintiffs seek the same

2   for Defendants' alleged breach of the implied covenant of good faith and fair dealing. (*Id.*

3   3:21–28).  Defendants argue that Plaintiffs have no rights to the alleged management fees paid

4   pursuant to the CEO Services Contract because the Settlement Agreement disclaims Plaintiffs'

5   rights to any such payment. (Defs.' MSJ 2:6–11, ECF No. 138).  Defendants also argue that

6   even if the Settlement Agreement's disclaimers are only effective when Ahmad serves as CEO

7   of Sage, the disclaimers remained effective in FY14 because Ahmad continued to serve as

8   corporate CEO of Sage, and he had only resigned the primarily-administrative role of hospital

9   CEO. (*Id.* 19:26–23:18).  The Court's below discussion first considers Plaintiffs' breach of

10  contract claim.

11              i.      Breach of Contract

12         The primary issue for the Court regarding Plaintiffs' breach of contract claim is whether

13  Kory disclaimed rights to all proceeds of the CEO Services Contract, even if the CEO Services

14  Contract provides compensation for management services.  The starting point for the

15  interpretation of any contract is the plain language of the contract. *McDaniel v. Sierra Health*

16  *and Life Ins. Co.*, 53 P.3d 904 (Nev. 2002).  When a contract contains clear and unequivocal

17  provisions, those provisions shall be construed to their usual and ordinary meaning. *Dickenson*

18  *v. Nevada*, 877 P.2d 1059, 1061 (Nev. 1994).  Then, using the plain language of the contract,

19  the court shall effectuate the intent of the parties, which may be determined in light of the

20  surrounding circumstances. *See NGA # 2 Ltd. Liab. Co. v. Rains*, 946 P.2d 163 (Nev. 1997); *see*

21  *also Burrows v. Progressive Casualty Ins.*, 820 P.2d 748, 749 (Nev. 1991).  Contractual

22  construction is a question of law "suitable for determination by summary judgment." *Ellison v.*

23  *Cal. State Auto. Ass'n*, 797 P.2d 975, 977 (Nev. 1990).

24         Plaintiffs argue that because Ahmad allegedly resigned as CEO of Sage in February of

25  2014, there is no contract for Ahmad to serve as CEO of Sage after that date. (Pls.' MSJ 23:25–

28:19).  Defendants respond that the Settlement Agreement unambiguously disclaims Kory's interest in the CEO Services Contract. (Defs.' MSJ 14:25–19:25).  Defendants further argue that even if the Court accepts Plaintiffs' proffered interpretation, the CEO exceptions in the Settlement Agreement remain applicable in FY14 because Ahmad resigned only as CEO of the hospital but remained CEO of the Sage Corporation. (*Id.* 19:26–23:18).

The Court begins its analysis by reviewing the language of the contract at issue.  The relevant portion of the Settlement Agreement contains two paragraphs encompassing four material agreements between the parties.  Paragraph 1.7 provides three of the relevant agreements: two related to the management fees Kory must receive under the Settlement Agreement and one exception.  Paragraph 1.8 provides another exception to Kory's right to management fees.  The Court provides the relevant quotations below.

Under ¶ 1.7, Defendants "will pay to KORY one-sixth (16.67%) of: (1) all management fees . . . that are paid by SAGE pursuant to the SAGE CONTRACT or any extensions or renewals thereof . . . ." (Settlement Agreement, Ex. 6 to Pls.' MSJ, ECF No. 130-5).  Paragraph 1.7 also describes the intended scope of Kory's right to receive one-sixth of all management fees.  It explains, "It is the intent of the parties that if [Defendants] or any of their owned or controlled entities executes a contract with SAGE that includes substantially the same services as are included in the currently existing contract and its extensions, KORY will be entitled to share in the payments received as part of this Agreement . . . ." (*Id.*).

The stated intent, however, is subject to exceptions under which Kory has no rights to receive any management fees.  The agreement provides, "This paragraph [1.7] shall not apply to the contract for AHMAD to serve as CEO of SAGE." (*Id.*).  Paragraph 1.8 includes a similar disclaimer that states, "Nothing in this AGREEMENT shall affect or give KORY any rights with respect to any contract pursuant to which AHMAD serves as the chief executive officer of Sage." (*Id.*).

For the most part, the effect of the agreements is straightforward.  It is beyond dispute that Kory has the right to receive one-sixth of all management fees paid under the Sage Contract. (*Id.* ¶ 1.7).  It is also beyond dispute that Kory has equal rights to management fees in future contracts when the management fees are substantially the same as those in the Sage Contract, unless an exception applies. (*Id.*).  However, the meaning of the exceptions requires greater analysis.

The relevant exceptions provide that Kory has no rights to management fees paid under: (a) "the contract for AHMAD to serve as CEO of SAGE;" and (b) "any contract pursuant to which AHMAD serves as the chief executive officer of SAGE." (*Id.* ¶¶ 1.7–1.8).  The exceptions are unequivocal.  If either of the two exceptions apply, then Defendants are not in breach of the Settlement Agreement by withholding any management fees paid under the CEO Services Contract in FY14.  Consequently, the Court next construes the meaning of the exceptions.

The exception in ¶ 1.7, by using a definite article, refers to a specific contract in existence at the time of the Settlement Agreement's execution: "the contract for AHMAD to serve as CEO of SAGE." (Settlement Agreement ¶ 1.7); s*ee Cochise Consultancy, Inc. v. United States ex. Rel. Hunt*, 139 S. Ct. 1507, 1514 (2019) ("'the use of the definite article . . . indicates that there is generally only one' person covered.") (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004); *see also Kaady v. Mid-Continent Cas. Co.*, 790 F.3d 995, 998 (9th Cir. 2014) ("Use of the definite article 'particularizes the subject which it precedes' . . . .") (quoting *Gale v. First Franklin Loan Servs.*, 701 F.3d 1240, 1246 (9th Cir. 2012)).  By contrast, the exception in ¶ 1.8, by employing the adjective "any," reaches all present and future contracts under which Ahmad "serves" as the CEO of Sage. (Settlement Agreement ¶ 1.8); Merriam-Webster, "any," available at https://www.merriam-webster.com/dictionary/any (defining "any" to mean "one or some indiscriminately of whatever kind.").  Paragraph 1.8 also differs from

1   ¶ 1.7 in that ¶ 1.8 disclaims all of Kory's rights created by the Settlement Agreement, whereas

2   ¶ 1.7 only disclaims Kory's rights that ¶ 1.7 of the Settlement Agreement creates.

3          Therefore, the Court construes the ¶ 1.7 exception to disclaim Kory's rights to payment

4   under the particular contract for Ahmad to serve as CEO of Sage that existed at the time of the

5   execution of the Settlement Agreement.[4]  The Court finds that the ¶ 1.7 exception applies to

6   "the contract" as long as the contract remains in effect, even if Ahmad ceases to serve as CEO,

7   because the Settlement Agreement identifies the contract by its creation of the obligation for

8   Ahmad to serve as CEO of Sage (it is "*the contract for*" Ahmad to serve as CEO of Sage),

9   rather than Ahmad's performance under the contract.  Put differently, a contract can be "the

10  contract for AHMAD to serve as CEO of SAGE" even if Ahmad does not fulfill his obligation

11  to serve as CEO.[5]

12         In contrast, the ¶ 1.8 exception refers to all present and future contracts under which

13  Ahmad "serves" as CEO of Sage.  Unlike the ¶ 1.7 exception, the scope of the ¶ 1.8 exception

14  excludes any such contracts once Ahmad ceases to perform as CEO of Sage thereunder because

15  the exception's scope is circumscribed by the time while "Ahmad serves as the chief executive

16  officer of SAGE."  Hence, if a contract directs Ahmad to serve as CEO of Sage, but Ahmad

17  does not serve as CEO of Sage as directed under the contract, then the hypothetical contract is

18  not one "pursuant to which Ahmad serves as the chief executive officer of SAGE."

19

20

———————————————

21

22  [4] The Court rejects Plaintiffs' argument that the term only disclaims an interest to payments Ahmad received as CEO, as opposed to the contract creating the CEO payment obligation; the position is foreclosed by ¶ 1.7's unambiguous references to "the contract" rather than a particular payment or provision. (*See* Pls.' MSJ 22:1–12).

23

24  [5] The Court's conclusion is buttressed by its goal to interpret all contracts to avoid rendering any particular provision superfluous. *United States ex rel. K & R Ltd. v. Mass. Hous. Fin. Agency*, 456 F. Supp. 2d 46, 59 (D.C. Cir. 2006) ("The Court strives to give each term of a contract independent meaning, so that no word or clause is rendered nugatory.").  If the Court applies Plaintiffs' proffered interpretation for the exceptions to apply only when Ahmad serves as CEO, then there is no circumstance the Court can imagine where the disclaimer of ¶ 1.7 would apply, but ¶ 1.8 would not.

25

1    Given that the Court finds "the contract for AHMAD to serve as CEO of Sage" refers to

2   a particular contract, the Court next identifies the contract.  The CEO Services Contract, which

3   RH and Sage executed prior to the Settlement Agreement, appoints RH "to perform the duties

4   and responsibilities of the position of Chief Executive Officer" of Sage. (CEO Services

5   Contract ¶ C, Ex. 5 to Pls.' MSJ, ECF No. 130-4).  The same provision of the Contract then

6   commands that RH "will dedicate the services of Ahmad R. Razaghi as its sole member to

7   [Sage] . . . ." (*Id.*).  Likewise, the First Amendment[6] to the CEO Services Contract, which the

8   parties executed after the Settlement Agreement but prior to FY14 states that "RH will initially

9   dedicate the services of Ahmad R. Razaghi . . . as its Chief Executive Officer . . . .). (First Am.

10  to the CEO Services Contract, Ex. 10 to Pls.' MSJ, ECF No. 130-9).  Thus, the Court concludes

11  that "the contract for AHMAD to serve as CEO of SAGE" is the CEO Services Contract.

12    Furthermore, even though the parties dispute whether Ahmad continued to serve as CEO

13  in FY14, the dispute is not material because Ahmad's continued performance is irrelevant to

14  the applicability of the disclaimer in ¶ 1.7 of the Settlement Agreement.  Hence, Kory has no

15  rights to any management payments made under the CEO Services Contract.

16    Therefore, the Court finds that Defendants are not in breach of the Settlement

17  Agreement even if Sage and Defendants amended the CEO Services Contract to include

18  payment for management services previously provided under the Sage Contract.  Accordingly,

19  with respect to Plaintiffs' claim for breach of the Settlement Agreement, the Court denies

20  Plaintiffs' Motion for Partial Summary Judgment and grants Defendants' Cross-Motion for

21  Partial Summary Judgment.  The Court next considers Plaintiffs' claim that Defendants

22  breached the implied covenant of good faith and fair dealing by retaining all management fees

23

24

25
[6] The CEO Services Contract as amended by the First Amendment was the operative CEO Services Contract in FY14 because the First Amendment extended the contract term through 2025, and the Contract was not amended further until 2018. (*See* First Amendment to the CEO Services Contract, Ex. 10 to Pls.' MSJ); (Second Amendment to the CEO Services Contract, Ex. E to Defs.' MSJ, ECF No. 138-6).

previously paid under the Sage Contract by allegedly encouraging the Board not to renew the Sage Contract and instead furnish the same payments under amendments to the CEO Services Contract.

ii.   <u>Implied Covenant of Good Faith and Fair Dealing</u>

In the alternative to breach of contract, Plaintiffs argue that Defendants breached the Settlement Agreement's implied covenant of good faith and fair dealing by diverting funds previously paid under the Sage Contract that Kory expected to receive under the Settlement Agreement into the CEO Services Contract, under which Kory disclaimed rights to payment. (*See* Pls.' MSJ 24:20–26:13). Defendants respond that Plaintiffs' claim fails as a matter of law because it is contradicted by the express terms of the Settlement Agreement. (Defs.' MSJ 23:21–24:17). Defendants alternatively argue that they did not breach their duty to Plaintiffs because the management fees provided under the CEO Services Contract were never similar to management fees provided under the Sage Contract. (*Id.* 24:18–26:23).

A contractual breach of the covenant of good faith and fair dealing arises "where the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract." *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 923 (Nev. 1991). This cause of action stands in contrast to one for breach of contract because of its requirement for literal compliance with the terms of the contract. *See Kennedy v. Carriage Cemetery Services, Inc.*, 727 F. Supp. 2d 925, 931 (D. Nev. 2010). Consequently, allegations that a defendant violated the actual terms of a contract are incongruent with this cause of action and insufficient to maintain a claim. *See id.*

Defendants argue that the Plaintiffs cannot state a claim as a matter of law because the allegations contradict the express language of the Settlement Agreement, effectively increasing Defendants' legal duties under the contract in contravention of Nevada law. (Defs.' MSJ 23:21–24:17). However, contrary to Defendants assertions, Plaintiffs are not attempting to add

to Defendants' duties under the agreement.  Rather, Plaintiffs are seeking to enforce the terms of the Settlement Agreement as the parties expressly stated they intended the terms would be performed despite Defendants' literal compliance with the Settlement Agreement. (*See* Settlement Agreement ¶ 1.7).  Given that Plaintiffs have shown: (a) Kory was entitled to receive management fees under the Settlement Agreement; (b) the parties to the Settlement Agreement expressly incorporated their intent that Kory would have rights to management payments made under the Sage Agreement or future contracts; but (c) the contracts referenced in the Settlement Agreement were terminated and amended to bar Kory from receiving his expected benefit of the bargain, the CEO Services Contract's disclaimer itself does not bar Plaintiffs' ability to recover under a theory of breach of the duty of good faith and fair dealing.

The core of the parties' dispute concerns whether the management fees paid under the Sage Contract were, in fact, "morphed" into the CEO Services Contract.  Specifically, the dispute hinges on whether ¶ 5.B of the original CEO Services Contract is equivalent to ¶ 5.B in the First Amendment to the CEO Services Contract.[7]  (*See* Pls.' MSJ, Statement of Undisputed Facts ¶ 22.b).  Paragraph 5.B of the CEO Services Contract, entitled "Performance Bonus," provides that, "Based upon [RH]'s past performance of CEO functions for the Corporation pursuant to the prior Management Services Agreement with [MMA], and in consideration for [RH]'s continued service, [Sage] agrees to pay [RDC] a one-time performance bonus of $25,000.00 within 20 days of execution of this Contract . . . . The Board shall perform a performance evaluation of [RDC] at the annual Board meeting each year to determine an annual performance bonus." (CEO Services Contract ¶ 5.B, Ex. 5 to Pls.' MSJ)  Under ¶ 5.B of the First Amendment to the CEO Services Contract, entitled "Incentive Fee," the Sage Board

---

[7] Plaintiffs also argue that Defendants integrated management fees into the CEO Services Contract by removing the cap on RH's earnings as CEO, but they provide no evidence in support of that theory outside of the contrasting contracts' text. (*See* Pls.' MSJ 25:27–26:6).  The Court cannot discern the alleged management fees received as salary on top of fees allegedly remitted under ¶ 5.B of the First Amendment to the CEO Services Contract.

"shall perform a performance evaluation of RH at the annual Board meeting each year and determine an annual incentive fee." (First Am. to the CEO Services Contract ¶ 5.B, Ex. 10 to Pls.' MSJ).  The provision also provides a formula to determine the incentive fee.  RH was to receive an incentive fee "if the Board determines that RH's performance [was] at least satisfactory." (*Id.*).  The incentive fee was to be calculated by subtracting the amount RH billed to the Board from "the fair market value of the professional services provided by RH during that year, including industry standard management fees." (*Id.*).  For comparison, under the Sage Contract, MMA was to receive a flat rate for management services, $900,000 per year, with 5% increases semi-annually. (*See* Sage Contract Second Management Addendum ¶ 2, Ex. 4 to Pls.' MSJ, ECF No. 130-5).

Plaintiffs contend that Ahmad influenced the Sage Board of Directors to allow the Sage Contract and associated Management Addenda to expire and instead incorporate the management services from the Sage Contract into the CEO Services Contract. (TAC ¶¶ 18–22, 27); (*See* CEO Services Contract, Ex. 7 to Pls.' MSJ, ECF No. 130-6); (First Am. to the CEO Service Contract, Ex. 10 to Pls.' MSJ, ECF No. 130-9); (Board Resolution, Ex. 9 to Pls.' MSJ, ECF No. 130-8).  Plaintiffs offer a variety of evidence in support of their position that the Sage Contract and CEO Services Contract as amended included payments for management services. Plaintiffs first direct the Court to the face of the First Amendment to the CEO Services Contract, which calculates the "incentive fee" by reference to "management services" that RH provides. (*See* First Amendment to CEO Services Agreement, Ex. 10 to Pls.' MSJ, ECF No. 130-9).  Plaintiffs also highlight that Defendants themselves referred to the First Amendment to the CEO Services Contract as "an extension for management services" in a letter between Ahmad and Alva Tom of the Navajo Area Indian Health Service ("IHS") (*See* IHS Letter, Ex. 11 to Pls.' MSJ, ECF No. 131-11).  Internal records also refer to payments made under the CEO Services Contract as management payments or management fees, including records from

one of Defendants' consultants and references in an internal audit. (*See* HAI Report and Invoices, Exs. 13–21 to Pls.' MSJ, ECF Nos. 130-10, 131-13–131-21); (S. Robert Bailey Aff. and Audit Reports, Exs. 26–27 to Pls.' MSJ, ECF Nos. 132-3–132-4).  Finally, Defendants appear to have used the same internal billing code—01.3801.6125—to refer to management fees paid under the Sage Contract and the First Amendment to the CEO Services Contract. (*Compare* MRS Invoice from November 2011 at 2565, Ex. 25 to Pls.', ECF No. 132-2) (RDC Invoice 1175 from March 2014 at 2914, Ex. 17 to Pls.' MSJ, ECF No. 131-17) (both using code to describe "management").

Defendants respond that the terms of the CEO Services Contract show that Kory knowingly disclaimed payment to some management fees because the CEO Services Contract creates obligations involving the management of Sage in several provisions. (*See* CEO Services Contract, Ex. 5 to Pls.' MSJ) (directing RH to "oversee the supervision and effective management of the day-to-day business operations of [Sage]."); (providing the Performance Bonus "[b]ased upon [RH's] past performance of CEO functions for the Corporation pursuant to the prior Management Services Agreement . . . .").  Defendants also argue that ¶ 5.B, "Performance Bonus," in the original CEO Services Contract and ¶ 5.B, "Incentive Fee," in the First Amendment to the CEO Services Contract are different names for the same payment. (*See* Ahmad Decl. ¶ 25, Ex. F to Defs.' MSJ, ECF No. 138-7).  Defendants explain that the First Amendment's formula's reference to "management fees" was added on advice from Sage's auditors to ensure that Sage would be in compliance with IRS regulations on tax-exempt organization, but Defendants maintain that the management fees referenced are not for the same management services provided under the Sage Contract. (*Id.*).

The Court finds that there is a genuine dispute of material fact regarding whether Defendants subsumed management payments that were originally paid under the Sage Contract into the CEO Services Contract.  As a preliminary matter, the Court notes it is difficult to

disentangle what payments for which specific management services Kory retains rights to under the Settlement Agreement.  Plaintiffs are not entitled to all management fees paid under the CEO Services Contract.  By the Settlement Agreement's own terms, the parties only expressed their intent that Kory continues to receive management fees similar to those paid under the Sage Contract. (*See* Settlement Agreement ¶ 1.7).  Plaintiffs knew or should have known that Kory disclaimed the right to payment for some management services when disclaiming rights in the CEO Services Contract.  Not only does the CEO Services Contract itself discuss payment for RH's management of Sage, but CEO services necessarily encompass management services.  A CEO, after all, is the highest-level manager of an organization.

However, given that the Sage Contract does not denote the particular management services it furnished payment for—instead providing a flat rate for management services—the Court is not in a position to assess whether the First Amendment to the CEO Services Contract includes payment for management services like those bargained for in the Sage Contract but not encompassed within the original CEO Services Contract.  The Court finds that Plaintiffs' evidence is sufficient to persuade a jury that the First Amendment to the CEO Services Contract paid Defendants management fees previously provided under the Sage Contract. Likewise, Defendants' affidavit of Ahmad indicates that the CEO Services Contract did not include any management fees paid under the Sage Contract, and Defendants therefore have not contravened the stated intent of ¶ 1.7 of the Settlement Agreement.  Accordingly, the Court denies both parties' Motions for Summary Judgment as to Plaintiffs' implied covenant of good faith and fair dealing claim.  The Court now turns to Defendants' Motion to Dismiss the Third Amended Complaint.

**B.    Motion to Dismiss**

Defendants move to dismiss all of Plaintiffs' claims to relief in the TAC.  The Court's below discussion addresses the sufficiency of each of the claims alleged.

i.     Breach of Settlement Agreement

A Court may appropriately consider the terms of a contract at the motion to dismiss stage when the contract is referenced in the complaint and its terms are not in dispute. *See Branch*, 14 F.3d at 454.   Here, the Court has already concluded in its preceding discussion that Plaintiffs cannot state a plausible claim that Defendants breached the Settlement Agreement by failing to pay Plaintiffs any management fees Sage remitted under the CEO Services Contract. Accordingly, the Court grants dismissal of Plaintiffs' breach of contract claim with prejudice.

ii.     Breach of Duty of Good Faith and Fair Dealing

a.  *Settlement Agreement*

In Nevada, an implied covenant of good faith and fair dealing exists in every contract, *Consol. Generator-Nevada, Inc. v. Cummins Engine Co., Inc.*, 971 P.2d 1251, 1256 (Nev. 1998), and a plaintiff may assert a claim for its breach if the defendant deliberately contravenes the intention and spirit of the agreement, *Morris v. Bank Am. Nev.*, 886 P.2d 454 (Nev. 1994). To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege: (1) plaintiffs and defendants were parties to an agreement; (2) defendants owed a duty of good faith to plaintiffs; (3) defendants breached that duty by performing in a manner that was unfaithful to the purpose of the contract; and (4) plaintiff's justified expectations were denied. *Perry v. Jordan*, 900 P.2d 335, 338 (Nev. 1995).

Plaintiff has alleged sufficient facts to state a claim for breach of the implied covenant of good faith and fair dealing.  The TAC alleges that (1) Plaintiffs and Defendants were parties to the Settlement Agreement; (2) Defendants owed a duty of good faith to Plaintiffs under the agreement; (3) Defendants performed in a manner unfaithful to the expressly stated intent of the Settlement Agreement by modifying the Sage Contract and the CEO Services Contract referenced in the agreement; (4) which interfered with Plaintiffs' justified expectations that

they would continue to receive a portion of the management fees paid by Sage. (*See* TAC ¶¶ 31–32, 48–63, 79–84).  The Court therefore denies dismissal of the claim.

However, as explained in the summary judgment discussion, the Court's holding is limited only to management fees paid under amendments to the CEO Services Contract—but not the CEO Services Contract as it existed at the time the parties entered the Settlement Agreement—because Plaintiffs disclaimed all rights to payment under the original CEO Services Contract.  Accordingly, to the extent Plaintiffs seek management fees paid under the amended CEO Services Contract, the Court denies the Motion to Dismiss.  To the extent Plaintiffs seek management fees under the original CEO Services Contract, the Court dismisses Plaintiffs' claim with prejudice.

### b.  *Attentus Operating Agreement*

Plaintiffs allege that Ahmad breach his duty of good faith and fair dealing under the Attentus Operating Agreement by concealing the approximately $1.8 million Bonus Payment from Kory and failing to remit any portion of the payment to Kory. (TAC ¶¶ 85–98, ECF No. 122).  Defendants argue that the Court should dismiss the claim because: (1) it is barred by the Release in the Settlement Agreement; (2) the allegations support a claim for breach of contract, which is incongruous with a good faith and fair dealing claim; and (3) Plaintiffs have failed to allege the purpose of the Operating Agreement or how the Defendants performed in a manner contrary to that purpose. (Mot. Dismiss ("MTD") 10:3–11:7, ECF No. 123).

The Court first addresses the release provision of the Settlement Agreement, which would bar Plaintiffs' claims to the Bonus Payment if the Court concludes that the release is enforceable.  Under ¶ 2.1 of the Settlement Agreement, the parties agreed that "[e]xcept for the obligations created by the terms and conditions of this Agreement, the Parties . . . hereby release and discharge each other party . . . from any and all actions, cause of action, suits, debts, dues, sums of money, . . . and liabilities whatsoever, known or unknown . . . arising out of or in

connection with the ACTION, through and including the date of this AGREEMENT . . . ."
(Settlement Agreement ¶ 2.1).

Plaintiffs allege that Ahmad concealed the Bonus Payment from Sage prior to the
execution of the Settlement Agreement. (*See* TAC ¶¶ 36–46).  The Bonus Payment relates to
the subject matter of the action referenced in the Settlement Agreement because the Settlement
Agreement arose from a dispute over Kory's rights to payment from Sage to MMA and RH.
(*See id.* ¶¶ 29–31); (*see also* Settlement Agreement, Preliminary Statement ¶ B).  Thus, the
terms of the release, if enforceable, would relieve Ahmad of any duty to pay Kory a portion of
the Bonus Payment.

However, the Court finds that although the release may bar Plaintiffs' claims to the
Bonus Payment, dismissal is inappropriate.  The Court may only grant a motion to dismiss a
claim on the basis of an affirmative defense if, from the facts alleged in the complaint, there is
no dispute that the affirmative defense would bar the claim. *See Asarco, LLC v. Union Pac.
R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014) (explaining that the court should not grant a
motion to dismiss on the basis of an affirmative defense if "from the allegations of the
complaint as well as any judicially noticeable materials, an asserted defense raises disputed
issues of fact.").  With respect to contract releases, a release may be voidable if it was procured
without the disclosure of all relevant facts. *See Las Vegas Ins. Adjusters v. Page*, 492 P.2d 616,
616 (Nev. 1972).  Here, Plaintiffs allege facts indicating that Ahmad fraudulently concealed the
Bonus Payment in an attempt to avoid remitting a portion of the payment to Kory. (*See* TAC ¶¶
36–43).  Accordingly, the Court finds that the facts alleged in the TAC raise a dispute regarding
the release's enforceability, and the Court therefore cannot grant dismissal based on the terms
of the Release.

However, the Court finds that dismissal of the claim is appropriate because the
allegations more aptly state a breach of contract theory, which is inconsistent with breach of the

duty of good faith and fair dealing.  Plaintiffs allege that Ahmad breached the Attentus Operating Agreement's terms by failing to remit to Kory "an equal share of all net revenue received from management services under the Sage Contract, healthcare consulting services, healthcare provider group and physician services, and 'all other related services.'". (TAC ¶¶ 18–19, 89–90, 92–93).  However, a good faith and fair dealing claim requires that the defendant literally comply with the terms of the contract. *See Kennedy.*, 727 F. Supp. 2d at 931.  Here, given that the TAC alleges facts that would support a claim to breach of contract, but Plaintiffs could state a viable claim after amendment, the Court dismisses the claim without prejudice.

### iii.   Breach of Fiduciary Duty

Plaintiffs argue that Ahmad breached his fiduciary duty to Kory by "willfully concealing the existence of the Bonus Payment and refusing to pay Kory his share of the Bonus Payment." (TAC ¶¶ 99–104).  Defendant seeks dismissal of the claim, arguing that the Plaintiffs do not adequately allege the existence of a fiduciary relationship, and the claim is time barred. (MTD 11:18–12).

"A breach of fiduciary duty claim seeks damages for injuries that result from the tortious conduct of one who owes a duty to another by virtue of the fiduciary relationship." *Stalk v. Mushkin*, 199 P.3d 838, 843 (Nev. 2009).  A "fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Id.*  Moreover, fiduciary relationships arise where the parties do not deal on equal terms and there is special trust and confidence placed in the superior party. *Hoopes v. Hammargren*, 725 P.2d 238, 242 (Nev. 1986).  To prevail on a breach of fiduciary duty claim, the plaintiff must establish: "(1) the existence of a fiduciary duty; (2) breach of that duty; and (3) the breach proximately caused the damages." *Klein v. Freedom Strategic Partners, LLC*, 595 F. Supp. 2d 1152, 1162 (D. Nev. 2009).

The Nevada Supreme Court has held that fiduciary duties arise as a matter of law in certain categories of relationships, including insurers and their insured, *Powers v. United Servs. Auto. Ass'n,* 979 P.2d 1286, 1288 (Nev. 1999); attorney and client, *Cook v. Cook*, 912 P.2d 264, 266 (Nev. 1996), spouses, *id.*; fiancés, *Fick v. Fick*, 851 P.2d 445, 449–50 (Nev. 1993); and corporate officers or directors and a corporation, *Leavitt v. Leisure Sports Inc.*, 734 P.2d 1221, 1224 (Nev. 1987).  In relationships falling outside these categories, Nevada law recognizes a duty owed in "confidential relationships," where "one party gains the confidence of the other and purports to act or advise with the other's interests in mind." *Perry v. Jordan*, 900 P.2d 335, 338 (Nev. 1995) (per curiam) (internal quotation marks and citation omitted).

Here, Plaintiffs have alleged that Ahmad breached a fiduciary duty to disclose the Bonus Payment to Kory, causing Plaintiffs damages. (TAC ¶¶ 99–104).  However, the Court must dismiss the claim because Plaintiffs have not alleged sufficient facts to demonstrate that Ahmad owed Kory a fiduciary duty.  The brothers' relationship does not fall into any of the per se fiduciary relationships recognized by the Nevada Supreme Court.  Nor do Plaintiffs allege facts indicating that Kory placed a special confidence in Ahmad, obligating Ahmad to act in Kory's best interest.  Plaintiffs' conclusorily assertion that a fiduciary relationship existed is insufficient to sustain the claim.  Thus, the Court grants dismissal of the claim without prejudice.[8]

iv.   Unjust Enrichment

Plaintiffs plead their claims for unjust enrichment in the alternative, "In the event the Court finds that no written contract" requires the payments described in the Settlement Agreement. (Compl. ¶¶ 109–110).  Defendants argue that the claim should be dismissed because it seeks payments allegedly required by contract. (MTD 17:24–18:12).

---

[8] For the same reasons discussed regarding the enforceability of the Settlement Agreement's release, the Court finds dismissal on the statute of limitations inappropriate at this stage of the proceedings because the limitations period may be tolled under the discovery rule. *See* NRS § 11.190.

As explained in the summary judgment discussion, the Settlement Agreement provided Kory rights to payments made under the Sage Contract and similar agreements, but the relevant question is whether Defendants' literal compliance with the Settlement Agreement violated their duty of good faith and fair dealing.  Accordingly, because there is a written contract creating the obligations Plaintiffs now seek to enforce, the Court dismisses the claim with prejudice as to the management fees. *See LeasePartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975,* 942 P.2d 182, 187 (Nev. 1997) ("An action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement.").  The Court dismisses without prejudice Plaintiffs' claim to the Bonus Payment because it remains uncertain whether the alleged right to payment derives from the terms of a contract.

> v.   Conversion

Plaintiffs' conversion claim alleges that Defendants converted the management fees owed under the Settlement Agreement and the Bonus Payment. (*See* TAC. ¶ 115).  Defendants argue that Plaintiffs must state a claim to an identifiable sum of money, and the claims are foreclosed by the economic loss doctrine. (MTD 12:15–13:7).

Although Plaintiffs argue that the claim is permissible because it is pled in the alternative to breach of contract, Plaintiffs' only alleged rights to one-sixths of the at-issue payments or a portion of the Bonus Payment arise *because of* the Settlement Agreement or other contract.  Accordingly, to the extent Plaintiffs rely on contractual theories of recovery, the claim is foreclosed by the economic loss doctrine as a matter of law. *Kenny v. Trade Show Fabrications W., Inc.*, No. 2:15-cv-410-JCM-VCF, 2016 WL 697110, at *5 (D. Nev. Feb. 18, 2016) ("Absent direction to the contrary from Nevada state courts, a claim for conversion rooted in defendants' failure to make payment pursuant to contract between the parties contravenes the purpose of the economic loss doctrine, and is therefore barred.").  The Court

therefore dismisses the claim with prejudice with respect to management fees.  The Court dismisses the claim without prejudice with respect to the Bonus Payment because it is uncertain whether Plaintiffs' alleged right to the payment derives from the terms of a contract.

vi.    <u>Intentional Interference with Contract</u>

Plaintiffs assert that Ahmad intentionally interfered with the MMA Operating Agreement by failing to remit the Bonus Payment to MMA. (TAC ¶¶ 120–128).  Defendants argue that the claim fails as a matter of law because a party cannot be liable for intentionally interfering with its own contract, and Plaintiffs have not sufficiently alleged the elements of the claim under Nevada law. (MTD 13:10–28).

To state a claim for intentional interference with contract under Nevada law, a Plaintiff must allege: (1) the existence of "a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *J.J. Industries, LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003).

The Court finds that Plaintiffs have adequately alleged the claim, and they are not barred from asserting the claim as a matter of law.  Plaintiffs have alleged: (1) the MMA Operating Agreement was a valid contract that obliged MMA to remit a portion of the Bonus Payment to Kory; (2) Ahmad knew of the contract; (3) Ahmad intentionally directed Sage to pay the Bonus Payment to RH instead of MMA to avoid payment to Kory; (4) disrupting Kory's rights under the MMA operating agreement; (5) causing Plaintiffs' damages. (TAC ¶¶ 120–128).  Plaintiffs allege that Attentus was a party to MMA, but Ahmad was not. (*Id.* ¶¶ 8–9, 123).  The allegation is sufficient to show that Ahmad was not a party to the MMA Operating Agreement because a limited liability company is a distinct legal entity from its members. *Cf. C.H.A. Venture v. G.C. Wallace Consulting Engineers, Inc.*, 794 P.2d 707, 709 (Nev. 1990).

//

vii.     Accounting

Plaintiffs argue that Defendants owe Plaintiffs an accounting for all payments made by Sage to Defendants and any entities owned or controlled by Defendants. (TAC ¶¶ 129–134). Defendants seek dismissal of the claim because of the absence of a fiduciary relationship between the parties. (MTD 14:1–25).

To state a plausible claim to an accounting, there must be a fiduciary relationship between the parties. *McNamara v. Voltage Pay Inc*., No. 2:15-cv-02177-JAD-GWF, 2017 U.S. Dist. LEXIS 137558, 2017 WL 3709057, at *4 (D. Nev. Aug. 28, 2017). As the Court addressed previously, Plaintiffs have not alleged sufficient facts to show the presence of a fiduciary relationship. Accordingly, the Court grants dismissal of Plaintiffs' accounting claim without prejudice.

viii.     Civil Conspiracy

Plaintiffs assert a claim to civil conspiracy, arguing that Defendants conspired together to harm Plaintiffs. (TAC ¶¶ 135–142). Defendants argue that the claim should be dismissed because it is not alleged with particularity. (MTD 14:26–15:23).

A claim for civil conspiracy sounding in fraud must be alleged with specificity. *See Diamond Resorts Int'l, Inc. v. Reed Hein & Assocs., LLC*, No. 2:17-cv-03007-APG-VCF, 2019 U.S. Dist. LEXIS 205358, 2019 WL 6310717, at *7 (D. Nev. Nov. 25, 2019). The parties dispute whether Plaintiff has sufficiently alleged a conspiracy. (*See* MTD 14:27–15:23); (MTD Resp. 20:22–21:17). Plaintiffs contend that asserting the Defendants "conspired together" to harm Plaintiffs, while incorporating the previous allegations by reference, is sufficient. (MTD Resp. 20:22–21:17). The Court disagrees. Here, Plaintiffs allege the ultimate outcome of the alleged conspiracy—Plaintiffs' being deprived the benefit of their bargain with Defendants—but Plaintiffs fail to allege any facts regarding the agreement between Defendants, their plan to allegedly defraud Plaintiffs, or the like. (*See id.*) (showing that Plaintiffs have alleged only the

participants, damages, and timing of the conspiracy); (*see also* TAC ¶¶ 135–139).

Accordingly, the Court dismisses without prejudice Plaintiffs' Civil Conspiracy claim.

ix.      <u>Alter Ego</u>

To state a claim for alter ego liability, a plaintiff must allege: (1) the corporation is influenced and governed by the person asserted to be the alter ego; (2) there is such unity of interest and ownership that one is inseparable from the other; and (3) the facts are such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction fraud or promote injustice. See Nev. Rev. Stat. § 78.747; see also *Polaris Indus. Corp. v. Kaplan*, 747 P.2d 884, 886 (1987).  Conclusory allegations of alter ego status are insufficient to state a claim to relief. *Donovan v. Flamingo Palms Villas, LLC*, No. 2:08-cv-01675-RCJ-RJJ, 2009 U.S. Dist. LEXIS 150421, 2009 WL10693913, at *6 (D. Nev. June 23, 2009)

Here, Plaintiffs sufficiently establish alter ego liability by alleging that RDC is solely owned by Ahmad, Ahmad and RDC intermingle funds, and failure to recognize alter ego liability would therefore cause injustice.  (TAC ¶¶ 144–145).  Accordingly, the Court denies dismissal of Plaintiffs' alter ego liability claim.

x.      <u>Successor Liability</u>

Plaintiffs argue that all business entity Defendants share uniformity with their officers, supporting a claim to successor liability. (TAC ¶¶ 146–147).  Defendants respond that the allegation is insufficiently pleaded because it does not identify any entities who are predecessors to the liability alleged. (MTD 17:11–24).

To state a claim for successor liability, a plaintiff must at minimum allege the entities who share the liability succeeded to. *See S.E.C. v. v. Inteligentry, Ltd.*, No. 2:13-cv-00344-RFB-NJK, 2015 WL 1470498, at *15 (D. Nev. Mar. 31, 2015).  Here, Plaintiffs do not even allege the entities who are predecessors or successors to the liability at issue, instead lumping

together all Defendants. (TAC ¶ 147).  The Court therefore dismisses the claim without prejudice.

xi.     <u>Punitive Damages</u>

Plaintiffs do not allege an independent claim to punitive damages; rather, the TAC seeks punitive damages in Plaintiffs' fiduciary duty and civil conspiracy claims, and it lists punitive damages in the relief sought at the conclusion of the TAC. (TAC ¶¶ 102, 141, 20:16).  Here, because the Court has dismissed Plaintiffs' claims for punitive damages, the Court need not address whether the Court should dismiss Plaintiffs' generalized request for punitive damages as Defendants urge. (*See* MTD 22:11–23:11).  The Court next addresses whether Plaintiffs should be given leave to amend the claims dismissed without prejudice.

**C.     Leave to Amend**

For all claims the Court has dismissed without prejudice, the Court provides Plaintiffs leave to amend.  Defendants argue that amendment would be futile because Defendants have now filed four Complaints in this action. (MTD 18:19–19:9).  However, Plaintiffs have not yet had the benefit of a court order identifying the deficiencies of the Complaints because each Amended Complaint has been filed based on Plaintiffs' request for leave to amend, which Defendants have consented to on each occasion. (*See* Stipulations to Amend, Non-Oppositions to Mots. Amend, ECF Nos. 47, 63, 119).  Plaintiffs may file an Amended Complaint within twenty-one (21) days from entry of this Order.  Failure to file an Amended Complaint by the deadline provided will result in dismissal of the unamended claims with prejudice.

//

//

//

//

//

## IV. <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss, (ECF No. 123), is **GRANTED in part** and **DENIED in part**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment, (ECF No. 129), is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Cross-Motion for Partial Summary Judgment, (ECF No. 138), is **GRANTED in part** and **DENIED in part**

**IT IS FURTHER ORDERED** that Plaintiffs may file an Amended Complaint within twenty-one (21) days from entry of this Order.  If no Amended Complaint is filed, the parties shall have an additional thirty (30) days to file a Joint Proposed Pretrial Order.

Dated this <u>30</u> day of September, 2020.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT