# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | |
|---|---|---|
| KORY RAZAGHI, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 2:18-cv-01622-GMN-NJK |
| vs. | ) | |
| | ) | **ORDER** |
| RAZAGHI DEVELOPMENT COMPANY, | ) | |
| LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Pending before the Court is the Motion for Summary Judgment, (ECF No. 197), filed by Defendants Ahmad Razaghi and Razaghi Development Company, LLC (collectively, "Defendants"). Plaintiffs Kory Razaghi and Attentus LLC, (collectively, "Plaintiffs") filed a Response, (ECF No. 211), to which Defendants filed a Reply, (ECF No. 223).[1] For the reasons discussed below, the Court **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment.

## I.   BACKGROUND

This case is the result of a falling out between two brothers who had been in business together. In 2006, brothers Kory Razaghi and Ahmad Razaghi formed Attentus LLC, a Nevada limited liability company. (Ahmad Decl. ¶ 5, Ex. A to Mot. Summ. J., ECF No. 199-1). Attentus was itself the sole member of Attentus Provider Group, LLC ("APG"), which contracted with physicians to provide medical services at Navajo Health Foundation-Sage Memorial Hospital ("Sage"). (*Id.* ¶ 7).

---

[1] Defendants object to several exhibits included in the Response. (Reply 10:11–10:2, ECF No. 223). Because the Court does not rely on any of the objected to exhibits in deciding the Motion for Summary Judgment, the Court need not address Defendants' objections.

<u>The MMA Operating Agreement</u>

In 2007, Attentus joined with Defendant Manuel Morgan to form M. Morgan & Associates, LLC ("MMA"), whose primary purpose was to secure developing contracts in the Navajo Nation. (*Id.* ¶ 8).  Attentus and Morgan entered into the MMA Operating Agreement, which provided that one-third of MMA's profits would be allocated to Morgan and the remaining two-thirds would be allocated to Attentus. (MMA Operating Agreement ¶ 8, Ex. E to Mot. Summ. J., ECF No. 199-5).

<u>The Attentus Operating Agreement</u>

Kory and Ahmad subsequently executed the Attentus Operating Agreement in 2010, which established how Attentus' income would be divided between the brothers. (Attentus Operating Agreement ¶ 7, Ex. D to Mot. Summ. J., ECF No. 199-4).  Pursuant to the Attentus Operating Agreement, Kory and Ahmad would receive different allocations of income depending on the services rendered by Attentus. (*Id.*).

<u>The Initial Development Contract</u>

On February 7, 2007, MMA entered into the Initial Development Contract with Sage for the purpose of developing a new hospital campus. (*See generally* Initial Development Contract, Ex. F to Mot. Summ. J., ECF No. 199-6).  The Initial Development Contract then went through a series of amendments.  Under the First Addendum, MMA and Sage agreed that MMA would provide professional management services to Sage. (*See generally* First Addendum, Ex. G to Mot. Summ. J., ECF No. 199-7).  The Second Addendum established that Sage would pay MMA's base management fee of $900,000.00 per year on a monthly basis, and the amount of the base management fee would increase yearly. (Second Addendum § 2, Ex. H to Mot. Summ. J., ECF No 199-8).  The Second Addendum also extended the term of the contract to September 30, 2013. (*Id.* § D).

///

Further, the Second Amendment stated that MMA would assign Ahmad to act as CEO of the hospital from March 9, 2009, through February 28, 2011. (*Id.* § 3).  Pursuant to the Second Addendum, Sage would pay Ahmad a $25,000 signing bonus and a yearly salary of $180,000 as well as provide him the same benefits as other Sage employees. (*Id.*).

From 2007 through 2010, Sage paid $900,000.00 annually in management fees to MMA. (Kory Dep. 44:4–45:14, Ex. V to Mot. Summ. J., ECF No. 200-1).  The management fees were entirely gross profit for MMA. (Ahmad Decl. ¶ 16, Ex. A to Mot. Summ. J.). Pursuant to the operating agreements, MMA distributed two-thirds of the management fees to Attentus and one-third to Morgan, and Attentus, in turn, distributed two-thirds to Ahmad and one-third to Kory. (Kory Dep. 33:16–34:3); (*see* MMA Operating Agreement ¶ 8, Ex. E to Mot. Summ. J.); (Attentus Operating Agreement ¶ 7, Ex. D to Mot. Summ. J.).  That is, through these two distributions, Kory would ultimately receive two-ninths of the management fees paid to MMA.[2]

The CEO Services Contract

Beginning in 2010, the relationship between Kory, Ahmad, and Morgan deteriorated and the partnerships between them ultimately collapsed. (Kory Dep. 102:1–8, Ex. V to Mot. Summ. J.); (10/16/10 email, Ex. I to Mot. Summ. J., ECF No. 199-9).  Ahmad then created a new entity, Razaghi Healthcare, LLC.  Razaghi Healthcare and Sage entered into a CEO Services Contract in 2011, effective retroactively to November 10, 2010. (*See generally* CEO Services Contract, Ex. J to Mot. Summ. J., ECF No. 199-10).  Pursuant to the CEO Services Contract, Ahmad would continue to serve as CEO of Sage. (*Id.* at 1 § A-C).  The parties dispute when MMA ceased providing services to Sage and when Ahmad's other entities took over providing all services. (*See* Resp. 10:14–12:10).  Ahmad maintains that all services he, Razaghi

---

[2] The parties erroneously calculate that Kory would ultimately receive only one-sixth of the management fees. (*See* Mot. Summ. J. 7:10–11).

Healthcare, or Defendant Razaghi Development Company ("RDC") provided to Sage were provided under the CEO Services Contract and its later amendments. (Ahmad Decl. ¶ 20, Ex. A to Mot. Summ. J.).

The Prior Litigation Settlement Agreement

After the relationship between the parties collapsed, Kory, individually and on behalf of Attentus and APG, sued Ahmad, Morgan, MMA, RDC, and Razaghi Healthcare in state court. (Prior Litigation, Ex. M to Mot. Summ. J., ECF No. 199-13).  The parties ultimately settled the prior litigation. (*See* Settlement Agreement, Ex. Y to Mot. Summ. J.).  Pursuant to the Settlement Agreement, Kory is entitled to one-sixth[3] of the management and development fees Sage paid under the agreements between MMA and Sage. (*Id.* § 1.7).  Additionally, Kory is entitled to a share of certain payments made pursuant to any contract between Morgan, Ahmad, or any of their owned and controlled entities and Sage that includes substantially the same services as those included in the Initial Development Contract and its amendments. (*Id.*).  The Settlement Agreement states that the contract between Sage and MMA would be reassigned to Morgan & Razaghi Healthcare, LLC ("MRH"), another one of Ahmad's entities. (*Id.* § 1.3). Ahmad would thereafter withdraw from Attentus and Attentus would withdraw from MMA. (*Id.* § 1.6).  The Settlement Agreement further entitles Kory to one-sixth of any bonus payment paid pursuant to the CEO Services Contract. (*Id.* § 1.9); (*see* CEO Services Contract § 5(B), Ex. J to Mot. Summ. J.).

The Bonus Payment

Sage paid Razaghi Healthcare a Bonus Payment of $1,842,529.97 on September 28, 2012, pursuant to the CEO Services Contract. (Ahmad Decl. ¶ 23, Ex. A to Mot. Summ. J.).

---

[3] Under the MMA Operating Agreement and Attentus Operating Agreement, Kory would have been entitled to two-ninths of these fees.  But the Settlement Agreement entitled Kory to only one-sixth. (Settlement Agreement § 1.7, Ex. Y to Mot. Summ. J.).  Accordingly, although the Court again notes the parties' erroneous calculation under the Operating Agreements, the Court relies on the one-sixth provision in the Settlement Agreement.

Ahmad told Kory about the Bonus Payment shortly thereafter, but the parties dispute when Kory knew or should have known about the Bonus Payment. (*Id.*); (*See* Resp. 40:19–41:11). At the time Kory learned about the Bonus Payment, he believed the Bonus Payment was a CEO payment he was not entitled to under the Settlement Agreement. (Attentus Dep. 146:2–148:14, Ex. V to Mot. Summ. J.).

<u>The CEO Services Contract Amendments</u>

The CEO Services Contract later went through its own series of amendments. (*See* CEO Services Contract Amendment Nos. 1, 2, Exs. K, L, ECF No. 199-11, 199-12).  When Kory learned of these amendments, Kory had concerns that Ahmad may have "buried management fees in his new CEO contract" that he would be entitled to under the Settlement Agreement. (*See* 11/22/13 Email, Ex. Q to Mot. Summ. J., ECF No. 199-17).  After reviewing the first amendment to the CEO Services Contract in 2013, Kory did not immediately accuse Ahmad of breaching the settlement agreement. (Kory Dep. 237:8–13, Ex. V to Mot Summ. J., ECF No. 200-1).

<u>The Fourth Amended Complaint</u>

Plaintiffs Kory Razaghi and Attentus LLC initiated this action against Defendants Ahmad Razaghi and Razaghi Development Company, LLC in August of 2018, around the same time Sage terminated the CEO Services Contract. (Pet. Removal, ECF No. 1); (Ahmad Decl. ¶ 33, Ex. A to Mot. Summ. J.).  After two Orders on motions to dismiss, the operative complaint is the Fourth Amended Complaint, which states five causes of action: (1) Breach of the Duty of Good Faith and Fair Dealing (Settlement Agreement); (2) Breach of Contract (Attentus Operating Agreement); (3) Unjust Enrichment; (4) Intentional Interference with Contractual Relations (MMA Operating Agreement); and (5) Alter Ego.  Defendants move for summary judgment on all claims.

///

## II.   <u>LEGAL STANDARD</u>

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)).  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citation and quotation marks omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating

that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). However, the nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn

in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

### III.   DISCUSSION

Defendants' Motion categorizes Plaintiffs' claims as relating to either Plaintiffs' "morphing theory" or the Bonus Payment.  Because Defendants address only one claim relating to the morphing theory, the Court begins by addressing the arguments pertaining to the Bonus Payment claims before turning to the arguments pertaining to each individual claim.

### A.  Bonus Payment Claims

The Motion groups the breach of contract, unjust enrichment, and intentional interference claims together as "Bonus Payment claims."  Defendants argue that the Bonus Payment claims fail because (1) Plaintiffs lack standing to assert claims on the bonus payment; (2) the Settlement Agreement's Release bars any claims relating to the bonus provision; and (3) the Bonus Payment claims are barred by the statute of limitations.[4]

#### 1.  Standing

"The irreducible constitutional minimum of standing" is comprised of three elements: (1) The plaintiff must have suffered an "injury-in-fact," which is a "concrete and particularized" invasion of a legally protected interest; (2) there must be a "causal connection" between the plaintiff's injury and the defendant's action; and (3) it must be "likely" that the plaintiff's injury will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citation omitted).  "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561.

Under Nevada law, members of a limited liability company ("LLC") have no direct ownership interest in the LLC's assets, *see* NRS 86.311(1), and, as a result they "are not

---

[4] Defendants further argue that each claim fails independently, as discussed below.

directly injured when the company suffers an improper deprivation of those assets." *See In re Real Mkt. Services, LLC*, 309 B.R. 783, 788 (S.D. Cal. 2004). Thus, members of an LLC lack standing to sue for claims that belong to the LLC. *See* NRS 86.381 ("A member of a limited-liability company is not a proper party to proceedings by or against the company, except where the object is to enforce the member's right against or liability to the company"); *In re KRSM Properties, LLC*, 318 B.R. 712, 718 (B.A.P. 9th Cir. 2004) ("[M]embers of LLCs cannot assert causes of action derived from causes of action owned by the LLC.").

Defendants argue that "all of the Bonus Payment claims are premised upon the argument that non-party Sage should have paid the Bonus Payment to non-party MMA." (Mot. Summ. J. 29:10–11). But none of Plaintiffs' claims assert that the Bonus Payment had to be paid to Plaintiffs under the MMA Contract, nor do Plaintiffs purport to bring these claims "on behalf of MMA." (Resp. 39:2–3). Accordingly, Defendants fail to meet their burden on summary judgment to demonstrate that Plaintiffs lack standing to bring the Bonus Payment claims, and the Court therefore DENIES the Motion as it relates to standing.

## 2. Release Provision

In its prior order on a motion to dismiss, the Court noted that the release provision of the Settlement Agreement "would bar Plaintiffs' claims to the Bonus Payment if the Court concludes that the release is enforceable." (Order 21:20–22, ECF No. 150). Under Nevada law, "a release may be voidable if it was procured without the disclosure of all relevant facts." (*Id.* 22:17–18) (citing *Las Vegas Ins. Adjusters v. Page*, 492 P.2d 616, 616 (Nev. 1972)). Thus, this Court further found that Plaintiffs alleged "facts indicating that Ahmad fraudulently concealed the Bonus Payment in an attempt to avoid remitting a portion of the payment to Kory," raising a dispute regarding the release's enforceability. (*Id.* 22:19–23). As a result, the Court could not dismiss Plaintiffs' Bonus Payment claims on the basis of the affirmative defense that the release provision bars such claims. (*Id.* 22:10–17).

Now, Defendants argue, "discovery has revealed that [Plaintiffs'] fraudulent concealment/recission theory is legally unsustainable." (Mot. Summ. J. 30:10–11). Defendants, however, assume that the Court's prior finding means that Plaintiffs must establish the elements of a fraudulent concealment claim, a claim not pleaded in the Fourth Amended Complaint. Defendants argue that a release can only be avoided based on "*fraud*, duress, mistake or any other basis for avoiding the release." (Reply 24:22–26) (emphasis in original) (quoting *Igert v. State Farm Mut. Auto. Ins. Co.*, 533 P.2d 1365, 1366 (Nev. 1975)). But Defendants' argument regarding the release provision is an affirmative defense. (*See* Order 22:10–23, ECF No. 150). That is, to prevail on summary judgment, *Defendants* must demonstrate the that the release provision bars the Bonus Payment claims and the absence of a genuine issue of fact regarding that conclusion. Defendants' argument that Plaintiffs failed to establish the elements of a nonexistent fraudulent concealment claim is a non-starter and does not persuade the Court on summary judgment because Defendants will have the burden of proving at trial the existence of an enforceable release provision.

Defendants further argue that Plaintiffs cannot rescind the Settlement Agreement. (Mot. Summ. J. 32:10–34:28). Again, Defendants fail to meet their burden on summary judgment. Defendants assume that Plaintiffs' Bonus Payment claims hinge on the rescission of the Settlement Agreement. (*See id.* 33:10–34:28). Plaintiffs do not mention rescission in their Fourth Amended Complaint, nor has the Court discussed rescission in any of the prior Orders. The Court will not grant summary judgment based on Defendants' argument that Plaintiffs cannot rescind the Settlement Agreement when Defendants have not explained why Plaintiffs' Bonus Payment claims fail unless Plaintiffs rescind the Settlement Agreement. And, even if Defendants met their burden on summary judgment, the Settlement Agreement contains a severability clause, which creates a genuine issue of material fact regarding whether rescission of the entire Agreement is necessary for Plaintiffs to prevail on their Bonus Payment claims.

1   (Resp. 40:1–16); (*see* Settlement Agreement § 5.8, Ex. Y to Mot. Summ. J.).  Accordingly, the

2   Court DENIES summary judgment based on the Release Provision.

3         **3.  Statute of Limitations**

4         Defendants next argue that the statute of limitations bars Plaintiffs' Bonus Payment

5   claims for unjust enrichment and intentional interference.[5]  Under Nevada law, the statute of

6   limitations for intentional interference and unjust enrichment is four years.[6]  NRS 11.190(2)(c);

7   *In re Amerco Derivative Litig.*, 252 P.3d 681, 703 (Nev. 2011); *Orr v. Bank of Am., NT & SA*,

8   285 F.3d 764, 781 (9th Cir. 2002).  The statute of limitations begins to accrue when a plaintiff

9   "knows or, through the use of reasonable diligence, should have known of facts that would put

10  a reasonable person on *inquiry notice* of his cause of action." *Winn v. Sunrise Hosp. & Med.*

11  *Ctr.*, 277 P.3d 458, 462 (Nev. 2012) (quoting *Massey v. Litton*, 669 P.2d 248, 252 (Nev. 1983)).

12  A plaintiff "is put on 'inquiry notice' when he or she should have known of facts that 'would

13  lead an ordinarily prudent person to investigate the matter further.'" *Id.* (quoting Black's Law

14  Dictionary 1165 (9th ed. 2009)).  Such "facts need not pertain to precise legal theories the

15  plaintiff may ultimately pursue, but merely to the plaintiff's general belief that someone's

16  negligence may have caused his or her injury." *Id.*

17        Defendants argue that Plaintiffs failed to investigate the Bonus Payment when they

18  learned about it in late 2013 or early 2014, more than four years before Plaintiffs initiated this

19  action in August 2018. (Mot. Summ. J. 35:18–19).  Indeed, in the deposition of Attentus, Kory

20  (as Attentus's representative) acknowledged that he first learned about the existence of the

21

22

23  [5] Defendants also seek summary judgment on Plaintiffs' "fraudulent concealment theory" based on the statute of limitations defense. (Mot. Summ. J. 35:5).  Because Plaintiffs have not alleged a claim for fraudulent concealment, the Court ignores this argument.  Defendants do not seek summary judgment on Plaintiffs' breach of contract claim, the only other Bonus Payment Claim, based on the statute of limitations defense. (*Id.* at 35 n. 144).

24  

25  [6] Defendants erroneously assert that the statute of limitations for intentional interference is three years. (Mot. Summ. J. 35:7–8).  The Nevada Supreme Court and the Ninth Circuit say otherwise. *See In re Amerco Derivative Litig.*, 252 P.3d at 703; *Orr*, 285 F.3d at 781.

bonus payment in late 2013 or early 2014. (Attentus Dep. 146:2–7, Ex. X to Mot. Summ. J., ECF No. 201-1).  Thus, Defendants meet their initial burden on summary judgment.

The Response, however, raises a dispute of material fact.  As Plaintiffs explain, Kory testified that when he learned of the *existence* of a bonus payment, he thought it was a CEO bonus to which Kory has no claim to. (Resp. 40:21–23); (*see* Attentus Dep. 146:2–148:14, Ex. X to Mot. Summ. J.).  While Defendants contend that Plaintiffs should have investigated the payment further, it is possible that Defendants concealed the nature of the payment so Plaintiffs would not have known to investigate the payment.  Drawing all inferences in the light most favorable to the non-moving party, the Court finds that a dispute of material fact exists regarding whether Plaintiffs were on notice of the bonus payment more than four years before initiating this suit.  Accordingly, the Court DENIES summary judgment based upon the statute of limitations.  Having denied all of Defendants' arguments pertaining to the Bonus Payment claims collectively, the Court now turns to Defendants' arguments for each claim independently.

## B.  Breach of Contract: Attentus Agreement

Defendants assert that Plaintiffs' claim for breach of the Attentus Agreement fails because Plaintiffs have no evidence of breach. (Mot. Summ. J. 36:10–37:15).  "A claim for breach of contract requires the plaintiff to demonstrate the following elements: (1) the existence of a valid contract; (2) a breach by the defendant; and (3) damages as a result of the breach." *See Cohen-Breen v. Gray Television Grp., Inc.*, 661 F. Supp. 2d 1158, 1171 (D. Nev. 2009); *see also Calloway v. City of Reno*, 993 P.2d 1259, 1263 (Nev. 2000).

Plaintiffs' claim for breach of the Attentus Operating Agreement "is premised on the notion that Ahmad, as a party to that contract and the MMA Operating Agreement, and as the CEO who orchestrated the Bonus Payment," knew that Sage issued the Bonus Payment for work performed by MMA, knew that any payments MMA received would be distributed in part

to Attentus, and knew that any payments Attentus received for management services would be divided between Ahmad and Kory pursuant to the Attentus Operating Agreement. (Resp. 41:14–23). Plaintiffs assert that "Ahmad's actions in preventing the payment from reaching Attentus in the first place fundamentally disrupted [the Attentus Operating Agreement], and therefore were a breach of Ahmad's obligations as a party to that contract." (*Id.* 41:21–23). But the Attentus Operating Agreement delineates how Attentus' assets and profits are to be distributed between Kory and Ahmad. (Attentus Operating Agreement ¶ 7, Ex. D to Mot. Summ. J.). Thus, as Defendants explain in their Motion, if the payment never reached Attentus in the first place, then Defendants' conduct would not constitute a breach of any term of the Attentus Operating Agreement. In other words, if the payment never reached Attentus, then the Attentus Operating Agreement was never in play, and Defendants could not have breached the agreement. Accordingly, the Court GRANTS summary judgment for Defendants on the breach of contract claim.

### C. Unjust Enrichment

"Unjust enrichment exists when the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof." *Certified Fire Prot. Inc. v. Precision Constr.*, 283 P.3d 250, 257 (Nev. 2012). "The law of Nevada is clear—where there is an express written agreement, a party may not assert a claim for unjust enrichment." *Rockstar, Inc. v. Original Good Brand Corp.*, No. 09-CV-1499, 2010 WL 3154120, at *5 (D. Nev. Aug. 9, 2010); *see also Lease Partners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 942 P.2d 182 (Nev. 1997).

Here, Defendants argue that Plaintiffs' claim of entitlement to the Bonus Payment is based on contracts. (Mot. Summ. J. 38:19–20). But rather than citing the contracts in question,

Defendants cite the Fourth Amended Complaint. (*Id.* at 38 n. 157–58). As Plaintiffs note, Plaintiffs are permitted to allege claims in the alternative. (Resp. 42:11–15). Thus, both parties appear to apply a motion to dismiss standard: by citing the Fourth Amended Complaint only, Defendants fail to present evidence to negate an essential element of Plaintiffs' unjust enrichment claim or demonstrate that Plaintiff failed to make a showing sufficient to establish an essential element to that claim. And by arguing that "an unjust enrichment or 'quasi-contract' theory can be asserted alongside a breach of contract claim if the complaint alleges facts under which the unjustly retained benefit could have been paid outside the bounds of the contractual relationship," (Resp. 42:19–22), Plaintiffs assume that the general principle permitting claims to be pled in the alternative is sufficient to survive summary judgment. Neither argument is persuasive at this stage of the litigation. Because Defendants have the initial burden on summary judgment, the Court will deny summary judgment based on the existence of express contracts.

Defendants further argue that Plaintiffs' unjust enrichment claim fails because Plaintiffs have no evidence that they (as opposed to Sage) conferred a benefit on the Ahmad Defendants. (Mot. Summ. J. 39:1–8). Indeed, Plaintiffs allege that Sage, not Plaintiffs, paid the Bonus Payment, thus conferring a benefit on the Ahmad Defendants. (Fourth Am. Compl. ¶ 103). But Plaintiffs argue that Sage remitted the $1.8 million bonus in recognition of MMA's work, which included several years of Plaintiffs' work. (Resp. 43:7–17). Thus, even though Plaintiffs did not confer a benefit in the form of payment to Defendants, a dispute of fact remains regarding whether Plaintiffs conferred a benefit in the form of labor, for which Defendants received compensation for and Plaintiffs did not.

Lastly, Defendants argue that Plaintiffs' unjust enrichment claim fails because non-party Razaghi-Healthcare, not Defendants, received the Bonus Payment. (Mot. Summ. J. 39:9–26). Defendants meet their initial burden on summary judgment by explaining that individual

members of a corporation are not liable for unjust enrichment of the corporation. (*Id.*) (citing *Dean St. Cap. Advisors, LLC v. Otoka Energy, LLC*, No. CV 17- 1781 (MJD/BRT), 2019 WL 1405910, at *11 (D. Minn. Mar. 28, 2019); *Johnson v. Ross*, 419 F. App'x 357, 363 (4th Cir. 2011)).   Nonetheless, Plaintiffs raise a dispute of material fact in their Response.   Plaintiffs point to exhibits following the money, suggesting that the money was deposited into a new account not used for any other transactions and then quicky withdrawn, "never to be seen again in any of the bank records that have been produced." (Resp. 43:18–24) (citing RDC 3716, Ex. 41 to Resp. ECF No. 216-1).   That is, Defendants may have routed the payment through a different bank account to conceal that they received the benefit.   Accordingly, the Court DENIES summary judgment on the unjust enrichment claim.

### D.  Intentional Interference: MMA Agreement

Under Nevada law, a party asserting a claim for intentional interference with contractual relations must show: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage. *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003).   A plaintiff must show the defendant intended to affirmatively induce the third party to terminate his or her contract with the plaintiff; merely taking an action which has the effect of disrupting or impeding a contract with a third party is insufficient to impose liability. *Id.* at 1268.

Defendants argue that Plaintiffs have no evidence that the MMA Operating Agreement was actually disrupted. (Mot. Summ. J. 40:17–20).   Specifically, Defendants maintain that even if Ahmad directed Sage to tender the Bonus Payment to non-party Razaghi Healthcare, such conduct would not constitute a disruption of the MMA Operating Agreement because Attentus cannot point to any provision in the MMA Operating Agreement that Ahmad's alleged conduct prevented the party from performing. (*Id.* 40:21–24).

As Defendants note, the MMA Operating Agreement, like the Attentus Operating Agreement, only provides how MMA's assets and profits are to be distributed among its members. (*Id.* 40:24–41:2); (*see* MMA Operating Agreement ¶ 8, Ex. E to Mot. Summ. J.). And Defendants maintain that none of their alleged actions—even if true—prevented MMA from distributing any assets or profits in its possession. (Mot. Summ. J. 41:2–3). Defendants contend that Plaintiffs are "really arguing that Ahmad interfered with the Sage/MMA Contract," but cannot state a claim for intentional interference with that contract because Plaintiffs are not a party to it and therefore lack standing to bring such a claim. (*Id.* 41:4–7).

At face value, the Court agrees with Defendants assessment. Defendants' alleged conduct more directly interfered with the contracts between Sage and MMA than the MMA Operating Agreement. Nonetheless, the Court declines to grant summary judgment on this claim. A dispute of material fact remains regarding whether Ahmad, as CEO of Sage, directed Sage to deliver a Bonus Payment to another entity (controlled by Ahmad) instead of MMA in order to hide the Bonus Payment from Kory and interfere with how MMA distributes its funds. (Resp. 44:5–17); (*see* Katigbak Dep. at 25–27, 37, 54–56, 57–58, 94, Ex. 24 to Resp., ECF No. 214-2). If Defendants intentionally directed the Bonus Payments elsewhere to circumvent the MMA Operating Agreement, a jury could find that Defendants intentionally interfered with the contract. Accordingly, the Court DENIES Defendants' Motion as to the intentional interference claim.

### E.  Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs assert a claim for breach of the implied covenant of good faith and fair dealing relating to the Settlement Agreement. (Fourth Am. Compl. ¶¶ 80–89). Defendants argue that summary judgment is appropriate on this claim, which Defendants call the "morphing theory," because Plaintiffs lack competent evidence of damages and competent evidence that any

*///*

alleged "morphing" occurred. (Mot. Summ. J. 16:15–17:7).  The Court finds that Defendants fail to meet their initial burden on summary judgment regarding both arguments.

### 1. Proof of Damages

First, Defendants argue that Plaintiffs have not presented evidence of damages.  Proof of damages is an essential element of contractual breach of implied covenant of good faith and fair dealing claims. *H&H Pharms., Inc. v. Cambrex Charles City, Inc.*, No. 2:16-cv-02946-RFB-BNW, 2020 WL 1258257, at *3 (D. Nev. Mar. 16, 2020), *aff'd*, 836 F. App'x. 619 (9th Cir. 2021).  "Summary judgment is appropriate when proof of damages is an essential element of a party's claims, and the party 'has no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages.'" *Id.* (quoting *Weinberg v. Whatcom Cnty.*, 241 F.3d 746, 751 (9th Cir. 2001)).

Defendants argue that Plaintiffs have presented *no* competent evidence of his alleged damages. (Mot. Summ. J. 18:1).  Specifically, Defendants argue that Plaintiffs have not disclosed any expert witnesses, Kory cannot opine as to his damages as a lay witness, and Plaintiffs made no effort to "disentangle" the management fees to which Kory is entitled to and those which he is not. (*Id.* 18:1–20:14).  Defendants further maintain that Kory is not entitled to certain types of fees. (*Id.* 23:3–24:11).  But Defendants ignore the detailed invoices Razaghi Healthcare submitted to Sage, which delineate categories of fees being paid. (*See* Razaghi Development Co. Invoices, Ex. 23 to Resp., ECF No. 214-1).  A jury does not need an expert witness or even a lay witness to explain the meaning of the invoices. *See Weinberg*, 241 F.3d at 751.

Defendants appear to concede that Kory is entitled to one-sixth of certain types of fees that were remitted from Sage to Ahmad and/or his entities; the parties disagree about which fees Kory is entitled to. (Mot. Summ. J. 21:5–22:5).  As Defendants point out, the Court has previously noted the difficulty of "disentangl[ing] what payments for which specific

1   management services Kory retains rights to under the Settlement Agreement." (Order
2   Dismissing TAC 18:25–19:2, ECF No. 50).  But Defendants assume that Plaintiffs must
3   disentangle these payments themselves to survive summary judgment. (*See* Mot. Summ. J.
4   21:14–23).  That is, Defendants conflate the difficulty of disentangling payments with leaving
5   the jury to calculate the precise amount of damages.  Rather, as Plaintiffs note, "the jury may
6   arrive at a damages figure by adding up all invoiced fees and excluding [] CEO salary
7   payments" or other payments the jury finds Kory is not entitled to. (Resp. 34:20–23).  Any
8   dispute regarding which invoiced fees should be included or excluded is an issue of fact for the
9   jury.  Thus, Defendants have not demonstrated that Plaintiffs failed to make a showing
10  sufficient to establish damages.

11         **2.  Evidence of "Morphing"**

12         Second, Defendants misconstrue Plaintiffs' claim for breach of the implied covenant of
13  good faith and fair dealing.  Defendants argue that Plaintiffs must have evidence
14  "demonstrating an associated change in the actual services provided" to show that "morphing"
15  occurred. (Mot. Summ. J. 26:16–27:2).  But Plaintiffs allege that the services Defendants
16  provided were the same throughout the relevant time period; that is, "Plaintiffs' theory is more
17  accurately stated as alleging that Defendants intentionally modified contracts outside of
18  Plaintiffs' knowledge or control in a manner that enabled Defendants to bypass the Settlement
19  Agreement's intended sharing of payments between parties." (Resp. 7:1–7).  Thus, Defendants'
20  argument regarding evidence of morphing is immaterial to Plaintiffs' claim for breach of the
21  implied covenant, and Defendants accordingly fail to meet their burden on summary judgment.
22  The Court therefore DENIES summary judgment on the breach of the implied covenant of
23  good faith and fair dealing claim.
24  ///
25  ///

### F.  Alter Ego

To invoke the alter ego doctrine under Nevada law, a plaintiff must prove that (1) the corporation is influenced and governed by the person asserted to be the alter ego; (2) there is such unity of interest and ownership that one is inseparable from the other; and (3) the facts are such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction fraud or promote injustice. NRS 78.747; *Polaris Indus. Corp. v. Kaplan*, 747 P.2d 884, 886 (Nev. 1987).  "[T]he corporate cloak will not be lightly cast aside." *Wyatt v. Bowers*, 747 P.2d 881, 883 (Nev. 1987).

In determining whether there is a unity of interest, courts consider the following factors: commingling of funds, undercapitalization, unauthorized diversion of funds, treatment of corporate assets as the individual's own, and failure to observe corporate formalities. *Lorenz v. Beltio, Ltd.*, 963 P.2d 488, 497 (1998).  Plaintiffs must "show by a preponderance of the evidence, that the financial setup of the corporation is only a sham and caused an injustice." *N. Arlington Med. Bldg., Inc. v. Sanchez Const. Co.*, 471 P.2d 240, 244 (1970).  This is because "merely influencing and governing a corporation does not necessarily demonstrate the unity of interest and ownership resulting in the requisite inseparability of a corporation and shareholder." *Wyatt*, 747 P.2d at 883; *see also Bonanza Hotel Gift Shop, Inc. v. Bonanza No. 2*, 596 P.2d 227, 229 (Nev. 1979) ("A mere showing that one corporation is owned by another, or that the two share interlocking officers or directors is insufficient to support a finding of alter ego. . . . Nor is mere mutuality of interest sufficient to make such a showing, without evidence of a commingling of funds or property interests, or of prejudice to creditors.").

Plaintiffs' Fourth Amended Complaint alleges that RDC is Ahmad's alter ego. (Fourth Am. Compl. ¶¶ 137–39).  Defendants argue that Plaintiffs have no evidence that (1) Ahmad and RDC comingled funds; (2) RDC was undercapitalized; (3) Ahmad, without authorization, diverted funds; (4) Ahmad treated RDC's assets as his own; or (5) there was a failure to

observe corporate formalities. (Mot. Summ. J. 42:11–16).  Defendants further argue that because Plaintiffs have no evidence demonstrating a unity of interest, "they likewise cannot demonstrate that adhering to the corporate fiction would promote an injustice because the actions that demonstrate a unity of interest 'must also be the cause of Plaintiff's injury' (e.g. undercapitalization made it impossible for RDC to pay its debts)." (*Id.* 42:17–21) (quoting *Polaris Indus. Corp.*, 747 P.2d at 887).

But Plaintiffs have produced exhibits demonstrating that, "over the span of five years, Ahmad has made a habit of transferring enormous amounts of funds between his RDC accounts, his personal accounts, accounts of his family, and accounts of his other entities of which he is the sole member." (Resp. 45:4–6); (*see, e.g.*, Wells Fargo Records, Exs. 35–41 to Resp., ECF No. 216-1).  The Court finds that these exhibits create a dispute of material fact precluding summary judgment.  Accordingly, the Court DENIES summary judgment as to the alter ego claim.

///
///
///
///
///
///
///
///
///
///
///
///

## IV.    __CONCLUSION__

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, (ECF No. 197), is **GRANTED in part and DENIED in part**. The Court GRANTS summary judgment for Defendants on the Breach of Contract (Attentus Operating Agreement) claim. The Court DENIES summary judgment on the Breach of the Duty of Good Faith and Fair Dealing claim, Unjust Enrichment claim, Intentional Interference with Contractual Relations (MMA Operating Agreement) claim, and Alter Ego claim. These four claims from the Fourth Amended Complaint will proceed to trial.

**IT IS FURTHER ORDERED** that the parties will have thirty days from the date of this Order to file a jointly proposed pretrial order pursuant to LR 16-3(b) using the form provided in LR 16-4.

**DATED** this __30__ day of September, 2023.

_____
Gloria M. Navarro, District Judge
United States District Court